ORIGINAL

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Tel: 671-472-7332
Fax: 671-472-7215

Paul Ortiz
Senior Attorney
Office of General Counsel
National Oceanic and Atmospheric Administration
501 West Ocean Blvd.
Suite 4470
Long Beach, California 90802
Tel: 562-980-4069

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM
OCT -4 2006
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 06-00029 |
| Plaintiff, | |
| vs. | **AFFIDAVIT OF JEFFREY M. POLLACK** |
| KOO'S 108, | |
| Defendant. | |

I, JEFFREY M. POLLACK, being duly sworn, do hereby depose and state:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the U.S. Department of Commerce, National

Oceanic and Atmospheric Administration, National Marine Fisheries Service, Office for Law Enforcement ("NOAA OLE"), presently assigned to the Honolulu Field Office, Honolulu, Hawaii. I have been a SA with NOAA OLE since June 2004. Part of my duties consists of investigating violations of United States fisheries laws codified under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), and its related regulations, which include prohibitions on foreign fishing vessels fishing in United States fishing waters without a valid permit. Before becoming a NOAA OLE SA, I was an Immigration and Customs Enforcement SA for around three years, and Internal Revenue Service Criminal Investigation SA for over six years, and in that approximate nine year time period, I investigated numerous fraud and money laundering investigations in the Central District of California. My formal education includes a Bachelor of Science in accounting.

## II. **PROPERTY TO BE SEIZED**

2. This affidavit is made in support of a Complaint for Forfeiture to arrest the foreign fishing Vessel **KOO'S 108**, including the Vessel's fishing gear, furniture, appurtenances, stores, electronic and documentary records (including plotters, fax machines and other devices), and catch of fish, for violating 16 U.S.C. § 1857(2)(B) (Foreign Fishing Vessel Engaged in Fishing within the United States EEZ without a Valid and Applicable Permit). 16 U.S.C. § 1861(b)(1)(A) states in part that with or without a warrant, a fishing vessel (together with its fishing gear, furniture, appurtenances, stores, and cargo) used or employed in the violation of any provision of this chapter may be seized. Further, Section 1861 also states that other evidence related to any violation of any provision of this chapter may be seized. The **KOO'S 108**, a Republic of the Marshall Islands ("RMI") flagged purse seine fishing vessel, is a 72.37 meter long, four deck vessel having a gross weight of 1,100 tons, and listed in vessel registration documentation as being owned by the KOO'S FISHING COMPANY ("KFC"), a RMI based company.

The Vessel's hull and superstructure are white in color, with the Vessel name printed on the right and left side of the front area of the Vessel. Further, the Vessel's international radio call sign of V7EF3 is printed about mid-ship on both sides of the Vessel.

### III. BACKGROUND INFORMATION

3. Based upon my training and experience as a NOAA OLE SA, and from information obtained from other NOAA personnel, I know the following:

#### A. Magnuson-Stevens Fishery Conservation and Management Act

4. The Magnuson-Stevens Act is the United States fishery law that governs the management of living marine resources, which includes fish, in the waters under the jurisdiction of the United States. The ultimate purpose of the Magnuson-Stevens Act is to help insure that the living marine resources, which includes highly migratory fish such as tuna, continue to exist at sustainable levels, while at the same time allowing the resource to continue to be available for harvesting. The Magnuson-Stevens Act attempts to accomplish the goal of a sustainable fishery by regulating the United States fishing industry, and by also regulating the fishing activities that occur in ocean areas where the United States claims sovereign rights.

5. A portion of the ocean area that the United States claims sovereign rights over, for the purpose of exploring, exploiting, conserving, and managing of natural resources, is the exclusive economic zone ("EEZ"). The United States considers that the EEZ is that area adjacent to the United States which, except where modified to accommodate international boundaries, encompasses all waters from the seaward boundary of each of the coastal states to a line on which each point is 200 nautical miles from the baseline from which the territorial sea of the United States is measured. The United States, and other nations, have the rights to control, manage, and use the natural resources, including living marine resources such as fish, within their respective EEZ's. Thus, the United States has jurisdiction to control fishing activities within its EEZ, including the EEZ

waters around United States territories and Pacific Insular Possessions of the United States.

6. Howland and Baker Islands are small uninhabited islands near the equator, due south of Midway Island, and they are considered Pacific Insular Possessions of the United States. Howland and Baker Islands, which are within 60 nautical miles of each other, provide the United States with an EEZ around the islands. The United States thus has sovereign rights over the fishery resources within the EEZ surrounding Howland and Baker Islands.

7. For a foreign fishing vessel to legally engage in fishing activities within the United States EEZ surrounding Howland and Baker Islands, the foreign fishing vessel would need to have a Pacific Insular Area fishery agreement ("PIAFA") permit.

8. According to the Magnuson-Stevens Act, fishing is defined in part as the catching, taking, or harvesting of fish, the attempted catching, taking, or harvesting of fish, and any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish. One type of fishing device that purse seine fishing vessels use to assist in their fishing operations is the fish aggregating device ("FAD"). The FAD consists of objects, such as floats and fishing nets, that are connected together and placed into the ocean to create a floating pile of material, to which a radio beacon buoy is attached. The FAD is allowed to drift in the ocean, and may drift for multiple weeks or months before a fishing vessel homes-in on the radio beacon attached to the FAD. FADs are used because once in the water for a period of time, fish will sometimes start to congregate under the FAD. Generally, small fish will gather under the FAD, and then eventually, large fish such as tuna may come to feed on the small fish. Thus, if a purse seine fishing vessel comes upon a FAD that has a large amount of tuna under the FAD, the vessel will deploy its net to catch the tuna fish. The common term used for the deployment of the net is that the vessel has done a set. Since FADs are used to harvest fish, their use by fishing vessels is considered to be an act of fishing.

9. Due to the fact that FADs drift with ocean currents, one fishing technique that poaching fishing vessels use is to illegally deploy FADs in a country's EEZ, knowing that the FADs will drift out of that EEZ with fish that aggregated under the FADs while inside the EEZ. The vessel will then attempt to catch those aggregated fish once the FADs have drifted to an area where the vessel can legally fish, such as in international waters.

10. There is concern in the government and the fishing industry of the United States and other nations that the stocks of highly migratory fish species, such as tuna, are being depleted below sustainable levels due to over fishing. In an effort to help sustain the fishery, the United States and other countries have entered into numerous fishery treaties, with the intention of regulating the catch of highly migratory fish species. The need for international cooperation is deemed necessary for the fishery to stay viable, due to the fact that there is only so much fish in the ocean to catch, and because highly migratory fish travel freely from one country's EEZ to another country's EEZ. Because many highly migratory fish provide high dollar returns, countries aggressively enforce their fishery laws, and the sovereign rights and exclusive fishery management authority over the highly migratory fish inside their respective EEZ. Thus, the United States considers the highly migratory fish inside its EEZ as an important economic resource.

**B. The Pacific Islands Forum Fisheries Agency**

11. The United States has entered into numerous fishery related treaties, and one of those treaties is known as the South Pacific Tuna Treaty ("SPTT"). The SPTT is primarily an access agreement for United States flagged fishing vessels to be able to fish in the EEZ of a number of Pacific island states. These Pacific island states are represented by an international agency called the Pacific Islands Forum Fisheries Agency ("FFA"). The FFA monitors the compliance of United States and other foreign nation fishing vessels with restrictions enacted by FFA member countries. For instance, a foreign fishing vessel may have a license to fish in Fiji's EEZ, but not have a license to fish in the Republic of the Marshall Islands ("RMI") EEZ. If the FFA detects that the

foreign fishing vessel is illegally fishing in the RMI EEZ, the FFA would contact the RMI government, and provide the RMI government with evidence of the violation. The evidence that the FFA may have ranges from observations from personnel on surveillance aircraft, to records from FFA observers onboard the licensed fishing vessels.

12. The different FFA member nations have individuals who are trained as FFA observers. These individuals attend formal FFA training where they learn about fishing operations, navigation, and other subjects that allow them to perform observer duties. The observers are assigned to fishing vessels that are authorized to fish in FFA member countries' EEZs. The observers go out to sea with the fishing vessels, and while at sea with the vessels, the observers monitor the fishing operations. The FFA observers typically record detailed accounts of their observations, including where the vessels have fished, and what species were caught.

### C. Staffing On A Foreign Purse Seine Fishing Vessel

13. Foreign purse seine fishing vessels are usually staffed by a small number of officers, and by the crew. On a Taiwanese purse seine fishing vessel, it is common that the person in overall command of the vessel is called the master. The other officers on a Taiwanese purse seine vessel will usually consist of a chief officer, who may also be called the captain, and a chief engineer.

## IV. SUMMARY OF PROBABLE CAUSE

14. This affidavit is submitted for the limited purpose of establishing probable cause to seize the foreign fishing Vessel **KOO'S 108**, for violating 16 U.S.C. § 1857(2)(B)(Foreign Fishing Vessel Engaged in Fishing within the United States EEZ without a Valid and Applicable Permit). This affidavit is intended to show that there is sufficient probable cause for the requested seizure warrant, and does not purport to set forth all my knowledge of the investigation into this matter. The evidence set forth in this affidavit is based on my personal observations, training, and experience, review of

documents, interviews of witnesses, information obtained from other Special Agents and government personnel, and information obtained from other sources as set forth below.

15. The evidence detailed in this affidavit shows that there is probable cause to believe that the foreign fishing Vessel **KOO'S 108** engaged in fishing operations in the United States EEZ surrounding Howland and Baker Islands without having a valid and applicable permit by deploying 6 FADs inside the United States EEZ. Evidence indicates that the master and the captain of the **KOO'S 108** were well aware that the Vessel was located inside the United States EEZ, and that it was illegal for them to deploy FADs inside the EEZ. Evidence of the master's and captain's knowledge resulted from their interference with a FFA observer who was onboard the Vessel during the illegal FAD deployments. While inside the United States EEZ, the captain repetitively coerced the FFA observer to record false vessel position data which would have reflected the Vessel's position to be outside of the United States EEZ. Further, evidence shows that the ultimate owner of the **KOO'S 108**, KWANG-MING KOO, had been civilly fined by NOAA for another one of his purse seine fishing vessels illegally deploying FADs into the United States EEZ surrounding Howland and Baker Islands back in August 2000.

16. Evidence of the **KOO'S 108's** FAD deployments and of the knowledge of the master and captain originated from a FFA observer, Dike Poznanski, who was onboard the **KOO'S 108** during the entire voyage within which the FADs were deployed inside the United States EEZ. Poznanski kept detailed written records of the captain's repetitive attempts to get Poznanski to falsely document the Vessel's position as being outside the EEZ. Poznanski also recorded navigational and position data in relation to FAD deployments as observed from Global Positioning System and radar readouts. Poznanski recorded this data contemporaneously to the FAD deployments and the captain's coercive attempts. The information Poznanski provided is considered reliable, for as a representative of the FFA, Poznanski attended formal observer training, and as a professional observer, he had already observed on other fishing vessels before his assignment to sail with the **KOO'S 108**.

## V. STATEMENT OF PROBABLE CAUSE

### A. Six Illegal FAD Deployments

17. Based on my review of FFA observer records and FFA vessel fish catch reports that I obtained from NOAA OLE SA Kevin Painter, from information I obtained from SA Painter, from an interview with Poznanski, from results of position plotting and a distance versus time analysis conducted by NOAA Pacific Islands Regional Office employee Robert Harman, who formerly was a NOAA OLE employee specializing in vessel plotting and position analysis, from an interview with Robert Harman, from information I obtained from U.S. Coast Guard ("USCG") LTJG Kyle Deems, and from my own observations, analysis, and knowledge, I know the following to be true:

   a. During the evening of December 31, 2003, while Poznanski was looking at nautical charts onboard the **KOO'S 108**, Poznanski was informed by MENG-HENG YEN, the Chief Officer/Captain of the **KOO'S 108**, that the **KOO'S 108** was inside Howland Island's waters.

   b. After Poznanski documented the **KOO'S 108's** position inside the United States EEZ surrounding Howland and Baker Islands at 6:07 pm on January 1, 2004, Poznanski observed two FAD deployments during that same evening, with the first at 8:56pm, and the second at 11:44 pm. I conducted analyses, which took into account information obtained from Robert Harman, which revealed that the two FADs were deployed inside the United States EEZ, and not in international waters, for deploying the FADs in international waters would have required the vessel to travel at speeds significantly higher than its maximum safe operating speed of 15.4 knots. To have deployed the 8:56 and 11:44 pm FADs in international waters would have required the vessel to have transited to a documented Vessel position at 5:22 am the next morning at speeds of approximately 26 or 39 knots, respectively. Further, had the **KOO'S 108** traveled to international waters to deploy the two FADs, and then, at its maximum safe operating speed, attempt to transit to the 5:22 am position near Howland Island, the

Case 1:06-cv-00029   Document 3   Filed 10/04/2006   Page 8 of 14

Vessel would have only been able to cover approximately 130 nautical miles if it started the transit at 8:56 pm, and 87 nautical miles if it started the transit at 11:44 pm. The approximate distance from the international waters location to the 5:22 am position was around 220 nautical miles. Thus, it would have been physically impossible for the two FADs to have been deployed outside the United States EEZ.

        c. According to USCG LTJG Deems, operating a vessel at speeds greater than its maximum safe operating speed can cause damage to a vessel, such as blowing an engine. Thus, the evidence supports that the two FADs were deployed in the United States EEZ. A position plot showing the distance from the EEZ border area to the next morning 5:22 am vessel position is attached to this affidavit as Attachment A (attachment A-1 shows latitudes and longitudes). Attachments A and B (Attachment B is mentioned in the next paragraph) both graphically depict the EEZ area and the surrounding international waters, or high seas areas. Further, the position points shown in those plots accurately represents recorded Vessel positions. The plots were obtained from Robert Harman and he incorporated descriptive information into the plots.

        d. Between the time of 5:10 am and 9:55 am on January 2, 2004, four FADs were deployed from the **KOO'S 108**, and all four of the FADs were deployed well within the United States EEZ surrounding Howland and Baker Islands. Poznanski noted that the first of the four FADs was deployed at 5:10 am, and thus would have been near the location of where the Vessel was at during the 5:22 am position report, which was relatively near Howland Island. Poznanski then explained that from the Vessel's position at 5:22 am, the Vessel followed a course of 300 degrees, and continued on that course throughout the time the remaining three FADs were deployed (a graphical description of the 300 degree course and the FAD deployments is shown on Attachment B).

### B. The Master And Captain's Knowledge That The FAD Deployments Were Illegal

18. There is probable cause to believe that CHIANG-SHOU YEN, the master of the **KOO'S 108**, and MENG-HENG YEN knew that it was illegal to deploy FADs and engage in fishing activity within the United States EEZ, based on the following:

    a. Review of Poznanski's observer diary and observer trip report which covered the time period wherein the FADs were deployed inside the United States EEZ, and information learned from my interview of Poznanski on August 10, 2005, reveal:

        i. During the voyage of December 16, 2003 through January 9, 2004, within which the FADs were deployed inside the United States EEZ around Howland and Baker Islands, CHIANG-SHOU YEN was the master of the **KOO'S 108**, and MENG-HENG YEN was the chief officer/captain of the Vessel.

        ii. During the evening of December 31, 2003, MENG-HENG YEN told Poznanski that the **KOO'S 108** was inside of Howland Island's waters, and that they could not fish.

        iii. On January 1, 2004, while the **KOO'S 108** was inside the United States EEZ, Poznanski visited the Vessel's wheelhouse to obtain Vessel position data, and during his visit, MENG-HENG YEN came over to talk with him. While MENG-HENG YEN was talking to Poznanski, CHIANG-SHOU YEN was standing nearby steering the Vessel and listening to MENG-HENG YEN statements to Poznanski. MENG-HENG YEN told Poznanski that there was a large school (of fish) of approximately 200 tons, just what they needed to get the Vessel loaded. MENG-HENG YEN proceeded to tell Poznanski that they were within Howland Island's waters, and then, MENG-HENG YEN insisted that Poznanski change the recorded position of the Vessel to show the Vessel outside of the United States EEZ. While MENG-HENG YEN was discussing this with Poznanski, CHIANG-SHOU YEN smiled and made short remarks to Poznanski. Thus, Poznanski knew that CHIANG-SHOU YEN knew what was occurring in MENG-HENG YEN's discussion with him (Poznanski).

-10-

Case 1:06-cv-00029   Document 3   Filed 10/04/2006   Page 10 of 14

iv. In response to MENG-HENG YEN's demand to record a false position for the Vessel, Poznanski retrieved a nautical chart, and pointed to an area on the chart that was outside of the United States EEZ around Howland and Baker Islands. To this, MENG-HENG YEN told Poznanski in Taiwanese that "that was excellent" and gave Poznanski the thumb-up approval gesture. Poznanski let MENG-HENG YEN believe that he (Poznanski) had used the false position data, even though Poznanski did document the correct and true position of the Vessel, which was inside the United States EEZ.

v. In addition to MENG-HENG YEN's initial coercive attempt to have Poznanski record a vessel position outside of the United States EEZ, MENG-HENG YEN continued through January 2, 2004 to pressure Poznanski multiple times to record Vessel positions outside of the United States EEZ.

vi. On January 8, 2004, MENG-HENG YEN approached Poznanski as Poznanski was reviewing the data in his (Poznanski's) observer workbook, and insisted that he (MENG-HENG YEN) be allowed to look at the workbook. As MENG-HENG YEN reviewed through the workbook, he came upon the pages in the workbook that covered the times when he had requested that Poznanski record Vessel positions showing the Vessel outside of the United States EEZ. MENG-HENG YEN discovered that Poznanski had never changed the position coordinates, and forcefully demanded that Poznanski change the coordinates as soon as possible. When Poznanski explained to MENG-HENG YEN that the Vessel never even set (deployed its net) in those areas, MENG-HENG YEN told Poznanski that there should not be anything that indicates that the Vessel was even near that area.

### C. The KOO'S 108 Did Not Have A Permit To Fish In The EEZ

19. Based on information I learned from Alvin Katekaru, the NOAA Assistant Regional Administrator for Sustainable Fisheries for the NOAA Pacific Islands Regional Office, I know the following to be true:

-11-

a. A foreign fishing vessel would have to have a Pacific Insular Area fishery agreement ("PIAFA") permit to legally fish within the United States EEZ at a Pacific insular possession area like Howland and Baker Islands.

b. No PIAFA permit has been issued to any foreign fishing vessel to fish in the Pacific insular possessions since the PIAFA mechanism came into existence in 1997.

c. If any foreign fishing vessel is fishing in the EEZ around Howland and Baker Islands, the foreign fishing vessel is doing so illegally.

### D. The Owner Of The KOO'S 108 Was Previously Fined For A Different Vessel Deploying FADs In The U.S. EEZ

20. Based on my review of FFA vessel registration applications for the KOO'S 108 and NIUGINI 103 received from SA Painter, NIUGINI 103 case settlement documents received from the NOAA Office of General Counsel, NIUGINI 103 case file documents received from the NOAA OLE Southwest Division, and information obtained from Internet web site for the Taiwanese government's Government Information Office, I know the following to be true:

a. In August 2000, the NIUGINI 103, a foreign purse seine fishing vessel, illegally deployed five FADs while inside the United States EEZ surrounding Howland and Baker Islands. The Vessel, on paper owned by the NIUGINI FISHING COMPANY, was in reality owned by KWANG-MING KOO of Taiwan, who was listed as the owner on the NIUGINI 103's FFA vessel registration application.

b. As a result of the NIUGINI 103 deploying FADs into the United States EEZ around Howland and Baker Islands, the NOAA Office of General Counsel issued a civil Notice of Violation and Assessment ("NOVA") to the Nuigini Fishing Company and to Tsuguo Utsumi, the master of the Vessel. The NOVA demanded the payment of a civil penalty for the illegal fishing activity within the United States EEZ. In the process of negotiating and signing a settlement with NOAA, a shipping agent, who expressed that he represented the Vessel's owner, informed NOAA that the NIUGINI 103 had become the

-12-

KOO'S 103, the owner of the Vessel was Mr. KOO and the KFC, and that the Vessel was currently based in the RMI. Further, the agent, on behalf of Mr. KOO and the KFC, ultimately agreed to pay the United States Government $50,000.00 (U.S. dollars) to settle the case.

    c. The **KOO'S 108's** FFA Vessel registration application lists the KOO'S FISHING COMPANY, LTD. as the Vessel's owner, and that the Vessel is a RMI flagged Vessel.

    d. During the interview of Poznanski on August 10, 2005, Poznanski informed me of the following:

        i. The KFC is owned by Mr. KOO, and Mr. KOO lives in Taiwan.

        ii. The KFC currently had six Vessels based out of RMI, and they were the **KOO'S 101, 102, 103, 106, 107, and the 108**.[1]

        iii. The KFC is a Taiwanese company.

    e. On a Taiwanese Government Information Office website, KWANG-MING KOO was listed as a national policy advisor to the Taiwanese President from the year 2000, and also as the chairman for the KFC from 1996. Further, an address provided on the website for KWANG-MING KOO was materially the same address as that provided for KWANG-MING KOO on the FFA Vessel registration application for the NIUGINI 103.

## VI. CONCLUSION

21. Based on the information contained herein, I believe there is probable cause to support the issuance of an arrest warrant, under 16 U.S.C. §1861, to arrest the **KOO'S 108**, including the Vessel's fishing gear, furniture, appurtenances, stores, cargo,

---

[1] Information learned during a meeting with KFC officials, RMI Government officials, and a defense attorney on September 24, 2006 reveals, that as of September 24, 2006, the KFC has four purse seine vessels in operation, and they are 101, 102, 107 and 108.

-13-

electronic and documentary records, and catch of fish for violating 16 U.S.C. § 1857(2)(B) (Foreign Fishing Vessel Engaged in Fishing within the United States EEZ without a Valid and Applicable Permit).

*[signature]*
JEFFREY M. POLLACK
Special Agent, NOAA OLE

SUBSCRIBED and SWORN to before me on this 2nd day of October ~~September~~, 2006.

*[signature]*

CARMELLETA Q. SAN NICOLAS
Notary Public
In and for Guam, U.S.A.
My Commission Expires: Aug. 15, 2010
Sirena Plaza, Ste. 500,
108 Hernan Cortez Avenue
Hagatna, Guam 96910

-14-